UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN NUNEZ-PALOMAREZ, | Case No. 23-cv-04524-WHO |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| VERIZON COMMUNICATION INC., et al., | Dkt. No. 64 |
| Defendants. | |

Plaintiff Martin Nunez-Palomarez (hereafter "Nunez") worked for defendant Cellco Partnership (d/b/a/ Verizon Wireless, hereafter "Cellco") for seven years before he resigned in 2022. Then he filed this suit against Cellco and its parent company, defendant Verizon Communications, Inc., alleging that they discriminated against him on the basis of his race or national origin (Nunez is Hispanic) when he was assigned to a less-favorable branch location and when he was passed over for a Managing Partner position. He also claimed that the defendants subjected him to retaliation after he lodged an internal complaint about unfair business practices within the company and potential discrimination with respect to territory assignment decisions. Defendants move for summary judgment on both claims.

Nunez has submitted very little evidence in support of his claims, and the evidence he does submit does not create a material disputed fact that would defeat summary judgment. The record (as opposed to what he alleged in the First Amended Complaint ("FAC"), Dkt. 20)), shows that the decisions Cellco made concerning Nunez's territory assignments and his advancement at the company were based on Nunez's poor performance or his own expressed preferences; they were not motivated by racial animus or discrimination. Nunez also has not rebutted Cellco's proffered legitimate, nondiscriminatory reason for the adverse employment actions: his well-documented, persistent performance issues throughout his last three years at Cellco. He cannot prevail on his

retaliation claim because the record does not show a causal link between his complaints and any adverse employment action taken against him.  And the record does not support a finding of constructive discharge because there is no evidence that Nunez was subjected to intolerable working conditions at any point during his seven years at the company.  Summary judgment is GRANTED in the defendants' favor and this action is dismissed in its entirety.

**BACKGROUND**

## I.    PROCEDURAL HISTORY

Nunez filed the underlying action on September 1, 2023.  Dkt. No. 1 (Complaint).  When I granted the defendants' motion to dismiss with leave to amend in November 2023, I indicated how Nunez might clarify his claims, referred him to the Court's Legal Help Center for unrepresented parties, and suggested that he review the Pro Se Handbook and Pro Se Templates and Forms on the Court's website.  Dkt. No. 19 (Order Granting First Motion to Dismiss).  His FAC stated plausible claims and defendants answered it in January 2024.  Dkt. No. 22.

In the run up to summary judgment, I addressed numerous concerns that Nunez had regarding discovery.  The central theme in each of the four (4) discovery disputes that the parties submitted, either individually or together[1], was Nunez's belief that the defendants had more information than they were producing.

In the first discovery dispute, filed on May 17, 2024, Nunez asserted that the defendants had failed to comply with General Order 71, because the defendants stated that they had "exchanged their Initial Disclosures pursuant to General Order No. 71, *subject to additional supplementation*."  Dkt. No. 43 (Discovery Order, quoting defendants' Case Management Statement and Rule 26(f) report).  I directed the parties to provide the *complete* General Order 71 Initial Discovery to one another within 15 days; I explained that the Initial Discovery should

---

[1] Nunez filed all of his discovery letters as stand-alone documents.  This did not comply with my standing order requiring parties to file joint discovery disputes.  Given Nunez's status as a pro se plaintiff, I did not require him to refile the documents the first two times, particularly given that the defendants filed prompt responses to his individually submitted letters.  The third time Nunez submitted an individual discovery dispute, I ordered the parties to meet and confer and then submit a joint letter, which they did.  Dkt. No. 61.

United States District Court
Northern District of California

encompass most, if not all, of the important documents that would exist in this case. I then directed Nunez to review all documents that the defendants had produced (or shortly would produce) in compliance with General Order 71 and then draft specific discovery seeking additional documents and information if needed. *Id.*

In a statement filed with the court prior to an October 29, 2024, Case Management Conference ("CMC"), Nunez once again raised his concerns that the defendants were not complying with General Order 71; he claimed that defendant Verizon was refusing to produce documents relevant to Nunez's employment. *See* Dkt. No. 47 (Nunez CMC Statement). Verizon's position remained that it lacked such responsive documents because it had never employed Nunez, only Cellco had. At the CMC, I ordered Verizon to file a declaration under oath describing its relationship with Cellco and provide Nunez with the documents upon which it based that description, and upon which it would base its motion for summary judgment. Dkt. No. 48 (Minute Order).

Verizon filed two declarations to that end. Karen Shipman, the Senior Manager for the Verizon Corporate Governance Group and Assistant Secretary of Cellco, filed a declaration explaining the relationship between Verizon and Cellco. According to her sworn declaration, Cellco is "indirectly, wholly owned by Verizon Communications Inc.," and "[a]t no point during [Nunez's] employment did Verizon Communications Inc. employ [Nunez]." Declaration of K. Shipman ("Shipman Decl.") [Dkt. No.49] ¶¶ 6-8. Verizon "does not exercise day-to-day control over the daily operations of [Cellco]," and during Nunez's employment, Verizon "did not exercise control over the working conditions or wages of [Cellco's] employees," nor was it involved in "any of [Cellco's] hiring or termination decisions" or "personnel decisions." *Id.* ¶ 11. Michelle DiMascio, the Global Payroll Associate Director at Cellco, filed a consistent declaration explaining that "[a]t no point during [Nunez's] employment did Verizon Communications Inc. employ [Nunez]." Declaration of M. DiMascio ("DiMascio Decl.") [Dkt. No. 50] ¶ 5. She explained that she reached this conclusion by reviewing W-2 Forms and wage statements for Nunez, available through Cellco's payroll system. *Id.* ¶¶ 6-8; *see also id.*, Exs. 1-2.

Nevertheless, in his second, individually filed discovery letter, Nunez continued to seek

United States District Court
Northern District of California

1    documents from Verizon.  Dkt. No. 51.  I noted that the Shipman and DiMascio declarations

2    indicated that Verizon had no involvement in this matter; however, to ensure that Nunez had

3    received all the documents that were relevant to his claims to which he is entitled, I scheduled a

4    status conference for January 7, 2025, where I would ask counsel for the defense if they had fully

5    complied with their General Order 71 obligations, and whether they were aware of any Verizon-

6    related entities that possessed documents that would be responsive to General Order 71 if those

7    entities had been named in the case.  Dkt. No. 52 (Order Concerning Discovery and Scheduling

8    Status Hearing).  I also ordered the parties to meet and confer about additional discovery issues

9    Nunez raised.  *Id.*

10    At the January 7, 2025, status conference, the defendants represented that they had fully

11    complied with their disclosure obligations and that they were not aware of any Verizon-related

12    entities that possess documents that would be responsive to the mandates of General Order 71 had

13    they been named in the case.  *See* Dkt. No. 57 (Minute Order for January 7 Status Conference).  I

14    explained to Nunez that there was no basis to disbelieve their representations, supported as they

15    were by sworn declarations.[2] After the status conference, Nunez filed yet another one-sided

16    discovery letter, once again claiming that the defendants were withholding documents from him.

17    Dkt. No. 58.

18    After ordering the parties to meet and confer and submit a *joint* letter, which they did, I

19    explained in my final discovery order that while Nunez maintained that the defendants had failed

20    to properly respond to his interrogatories, nothing supported that accusation—the defendants

21    represented that they had responded to the fullest extent they were able, and the record supported

22    their position.  Dkt. No. 63 (Final Discovery Order) 1.  Cellco had responded to all formal

23    discovery requests, supplemented its General Order 71 responses, and produced additional

24    documents that Nunez had identified, including an investigative report that Nunez specifically

25    requested.  *See* Final Discovery Order 2.  Verizon's representations that it did not have any

26

27    _____

28    [2] In the same minute order, I noted that Nunez conceded that *he* had not complied with his
discovery obligations; I ordered that he respond to the defendants' interrogatories and document
requests within a week of the status conference.  Dkt. No. 57.

United States District Court
Northern District of California

responsive documents were credible.  Today, I have no reason to doubt the defendants'

representations that they produced all responsive documents.  Nunez offered no evidence that any

other Verizon entity would possess more.

## II.    EVIDENCE OF RECORD ON SUMMARY JUDGMENT

Nunez has submitted very little evidence to support his opposition to defendants' motion.

In light of his pro se status, in this Order I occasionally refer to his allegations in the FAC to

provide more context for the issues raised.  Those allegations are not evidence, of course, and the

evidence of record often rebuts them.  Nunez was deposed, and excerpts of his testimony were

provided by defendants.

### A.    Verizon Communications, Inc., Cellco Partnership, and Nunez

Cellco is indirectly, wholly owned by Verizon Communications, Inc., (hereafter,

"Verizon"), the parent company for Cellco.  Declaration of Ashley Rippolone ("Rippolone Decl.")

[Dkt. No. 64-1] ¶ 7; Shipman Decl. ¶ 6.  Cellco is a separate legal entity with its own board of

directors and officers; Verizon does not exercise immediate day-to-day control over the daily

operations of it.  Shipman Decl. ¶¶ 5-8.

Nunez began working for Cellco on September 14, 2015.  *See* Rippolone Decl. Ex. A

(Nunez Offer Letter).  At no point during Nunez's employment did Verizon employ Nunez.  *Id.*;

*see also* Shipman Decl. ¶ 7.

### B.    Nunez's employment at Cellco

Nunez began at Cellco as a "Solutions Specialist."  Rippolone Decl. Ex. A.  He then held

the position of "Business Account Specialist."  *Id.*, Ex. B (Nunez Deposition Vol. I) at 44:17-19.

He was promoted to Business Account Manager on July 7, 2019.  *Id.*, Ex. C (Nunez Business

Account Manager Offer Letter).  Cellco changed the Business Account Manager title to "Account

Manager—Business Sales" and then again to Senior Account Manager—Business Sales ("SAM").

*Id.*, Ex. B (Nunez Depo. Vol. I) at 50-51.  As a SAM, Nunez was responsible for cold calling,

following up on Cellco's leads, engaging with customers directly within particular territories,

understanding and selling software solutions, generating revenue and meeting sales targets, and

tracking and reporting progress through Salesforce automation tools.  Rippolone Decl., Ex. B

United States District Court
Northern District of California

1    (Nunez Depo. Vol. I) at 53-54; Declaration of Jeff Kinsey ("Kinsey Decl.") ¶ 4, Ex. A

2    (BAM/SAM Job Description).  Nunez reported to Jeff Kinsey, San Francisco Managing Partner,

3    from the time he undertook the "SAM" role until he resigned from Cellco effective September 22,

4    2022.  *See* First Amended Complaint ("FAC") [Dkt. No. 20] 5.

5         **C.    How employee performance is evaluated at Cellco**

6         All SAMs at Cellco must meet various metrics as part of their quota each month.  Each

7    month the company generates a composite score for each SAM based on a number of those

8    metrics.  *See* Declaration of Brian Davidson ("Davidson Decl.") [Dkt. No. 64-2] ¶ 11, Ex. B

9    (Business Market National Performance Guidelines).  If a SAM fails to achieve at least an 80%

10   composite score on a rolling three-month average, then they are placed on a Performance

11   Improvement Plan ("PIP").  *Id.*   The PIP process includes an informal step called an "Action

12   Plan," which focuses on sales activities and behaviors intended to improve and avoid progression

13   to the formal PIP.  If Cellco employees have a composite score over 80% for three months, they

14   can come off the PIP.  *Id.*

15        At Cellco, the Director, Associate Directors, and Human Resources personnel attend

16   monthly performance calibration calls where they review employees whose metrics fall below the

17   minimum 80% composite score on a rolling three month average, or, in the case of someone who

18   is already on a PIP, below the minimum composite score for a single month score.  *Id.* ¶ 12.

19   Sometimes, circumstances that are considered beyond an employee's control result in low

20   performance.  When that happens, the low performance is logged by Cellco as an "exception."

21   The exception reasons are tracked.  If an employee has an exception logged as explaining their dip

22   below the minimum composite score, then Cellco does not send that employee through the

23   performance management process.  *Id.*

24        **D.    Nunez's performance at Cellco**

25        Nunez was promoted to Business Account Manager (later, referred to as "Senior Account

26   Manager—Business Sales" or "SAM") in July 2019.  He received a "developing" rating at his

27   end-of-year performance review for 2019, which is the lowest rating available.  Davidson Decl. ¶

28   9; *id.* Ex. C (Nunez 2019 Performance Appraisal).  In 2020, he failed to meet the requisite 80%

United States District Court
Northern District of California

rolling composite score from March through August 2020, but he was given an exception because of the COVID-19 pandemic, a circumstance out of his control. *Id.* ¶ 10. From October 2020 to February 2021, Nunez also failed to meet the minimum composite score but received another exception for being on COVID-leave from November 16, 2020, through December 24, 2020. *Id.* According to Cellco's Human Resources Business Partner, and former Human Resources Consultant Brian Davidson, in a vacuum Nunez would have been issued a "developing" rating based on his 2020 metrics but he was given a "performing" rating in light of the COVID-19 pandemic and because he was not on a formal PIP for 2020. *Id.* ¶ 10; *id.*, Ex. D (Nunez's 2020 Performance Appraisal).

During 2020 into 2021, Nunez's manager, Tim Gartner, repeatedly put Nunez on notice that his performance was not meeting expectations and required improvement. Davidson Decl. ¶ 14. Gartner told Nunez in August 2020 that his productivity was "still at the bottom of the pack," identified ways in which Nunez could improve (including "[c]ontrol what you can which is the amount of time you spend with each customer"), and that Gartner would like to "take action now so that it's not a similar conversation" at the next month's check in. *Id.*, Ex. F. Performance notes that Gartner shared with Nunez in October 2020 stated: "as a tenured BAM, I not only expect better, but I need better, please work to gain more meetings . . . so that we can identify more opportunities and drive timelines. . . . Please identify your gaps and again let's work on ramping the funnel up as quickly as possible." *Id.* More notes from what is referred to as a "1 on 1 Funnel Review" for the last week of October 2020 show Gartner informing Nunez that he was "still way behind target for growth," and identifying "gaps" in his performance. *Id.*

In April 2021, Gartner noted that Nunez had a "very down month" with a "consistent pattern around minimal to no participation across the metric spectrum." *Id.*, Ex. F at 5-6. For May 2021, Gartner stated Nunez was "certainly up from April" but short of the "overall target/quota on a few of the metrics aside from traditional growth," explaining that Nunez had fallen far short of Cellco's expectations for BAMs like Nunez in terms of "calls per month" (152 as compared to the expected 400) and in terms of "first meetings," (5 in comparison to team average of 9). *Id.*, Ex. F at 5. In a call with Nunez, Gartner stated that he was "[e]xcited to see

7

what June brings and how you can also begin taking on a mentorship role with some of our new members of the team since you are such a resource." *Id.*

> **E.     Nunez's April 2021 internal complaint about Territory Assignments and third-party business relationships, and Cellco's Investigation**

Nunez approached Cellco's Human Resources department in April 2021 about his perception that the "territory assignment process . . .  was discriminating against him" for being Hispanic, and about his concern that Cellco was "not allowing [him] to move outside of the Mission territory."  Rippolone Decl. ¶ 3, Ex. B (Nunez Depo Vol. I) at 160:8-24.  He told HR that he believed his national origin had been used as a criterion for assigning him to the Mission territory in San Francisco.  Rippolone Decl. ¶ 3, Ex. B (Nunez Depo. Vol. I) at 160:21-24; Davidson Decl. ¶¶ 16,17, Ex. G at 3.  He further alleged that his manager did not allow him to move to other territories because he is Hispanic, and that he had been looked over for an open territory in October 2020.  Davidson Decl. ¶¶ 16, 17; *id.*, Ex. G (Davidson's Investigation Report and Witness Interview Notes).  In addition to discrimination, he complained about what he perceived to be possibly unfair business practices with respect to Cellco's relationship with a third-party company.  At various times in this lawsuit he has identified one topic or the other from this internal complaint as the impetus for purportedly retaliatory actions by Cellco.

Following Cellco's policy when an employee lodges a discrimination complaint, Davidson investigated Nunez's concerns about territory assignments from May 11 to May 19, 2021.  Davidson Decl. ¶ 17.  During the course of the investigation, Davidson interviewed Nunez's then-Managing Partner, Gartner, about the criteria used to fill a vacant territory.  Gartner explained that he considered performance ratings, performance activity, time on the team, specific needs and knowledge needed in an open territory, and the background and strength of the applicant pool, which included leadership experience.  *Id.*, Ex. G.  He stated that he did not consider whether a candidate was Hispanic as a criterion when evaluating candidates for the Mission territory, and explained that a non-Hispanic, non-Spanish speaking individual had held the Mission territory before Nunez was assigned there.  *Id.*  He asserted that the reason Nunez did not receive different territory in October 2020 was because of his ongoing performance issues.  *Id.*, Ex. G at 6-7.

United States District Court
Northern District of California

Before Gartner met with Davidson about Nunez's concerns, he had offered Nunez a new territory; Nunez declined and chose to remain in the Mission territory. Rippolone Decl. Ex. B (Nunez Depo. Vol. I) at 135, 140. Davidson's investigation notes state that "after [Nunez] had contacted HR and prior to HR meeting with his Manager, [Nunez] was already offered the opportunity for a new territory assignment which he declined." *See* Davidson Decl. Ex. G. According to the FAC, Nunez declined the position because the territory—which was located in San Francisco's "Tenderloin" neighborhood—had suffered in the aftermath of COVID-19 and he perceived it to be a less desirable position as a result. FAC at p. 9.

### F. Other Cellco employees' promotions and territory assignments

Nunez alleges that his relatively less experienced Caucasian colleagues at Cellco were selected for more favorable positions. Rippolone Decl. Ex. B (Nunez Depo. Vol. I) at 137. He gave two examples in the FAC. He alleged that Ken Cimino was a less experienced Caucasian colleague at Cellco who was assigned a more favorable position, but the "more favorable" position to which Cimino was assigned was the Tenderloin territory that Nunez turned down when it was offered to him. FAC at p. 9. Nunez testified that he declined the offer because he knew Cimino would get the Tenderloin territory and he "knew [he] was declining it for [Cimino]," which he was "fine" with. Rippolone Decl. Ex. B (Nunez Depo. Vol. I) 140:9-141:6.

Nunez also alleged in the FAC but offered no evidence that "Caucasian male G" was assigned to the "prestigious Financial District territory despite having no experience in the Verizon Business Group," which Nunez says "favored the Caucasian male over a Hispanic applicant who had two years of Verizon Business experience." FAC at p. 9. He offered no evidence of this. He testified, to the contrary, that he had no personal knowledge of any of his colleagues' qualifications, educational background, experience level, tenure, performance metrics, or the reasoning behind their selection for various territories and positions. Rippolone Decl., Ex. B (Nunez Depo. Vol. I) at 137-140, 142-145, 146-147.

### G. The territory assignments and San Francisco and Santa Rosa Managing Partner roles

On October 13, 2021, about six months after he filed internal complaints about the territory

1   assignment process, Nunez applied for the San Francisco Managing Partner position.  He

2   interviewed for the role on October 28, 2021.  Declaration of Todd Mundy ("Mundy Decl.") ¶ 4.

3   According to Mundy, who was the "Director – Business Sales" and part of Nunez's interviewing

4   panel, Nunez's interview was "lackluster." *Id.*   Additionally, "his responses lacked detail, content,

5   and were at times non-responsive to the questions asked . . . [and], he lacked two of the preferred

6   qualifications for the position: (1) meeting or exceeding sales targets, and (2) experience leading a

7   high-performing sales team." *Id.*

8          According to Mundy, none of the applicants was qualified to lead the San Francisco

9   territory as Managing Partner; because of the complexity of the role, "an experienced leader" was

10  "best." *Id.* ¶ 5.  Because of this dearth of qualified applicants, Mundy approved the decision to

11  cancel the search for the Managing Partner position.  Instead, Jeff Kinsey, the Managing Partner in

12  Santa Rosa, was moved to fill the San Francisco position.  Kinsey had been the Managing Partner

13  in Santa Rosa for Cellco for 14 years.  *Id.* ¶ 6.  A new requisition for a Managing Partner in Santa

14  Rosa was opened to replace Kinsey.  Heath Owensby, Associate Director – Business Sales,

15  informed the candidates who had applied for the San Francisco role that the job requisition was

16  cancelled; he encouraged them to apply for the Santa Rosa position if they were interested.

17         Nunez applied for the Santa Rosa position.  According to Cellco, he was rejected "due to

18  his poor performance record and failure to meet the preferred qualifications for this position." *Id.*

19  ¶¶ 8-9.  The individual who was hired for the Santa Rosa Managing Partner position interviewed

20  well and had eight years of strong performance results.  *Id.* ¶ 12.

21         On October 29, 2021, Nunez emailed Mundy and Owensby to express his dissatisfaction

22  with the decision to move Kinsey from Santa Rosa to San Francisco.  Nunez stated that he was

23  better qualified than Kinsey and requested that the decision be reconsidered because it was

24  "blatantly unfair."  He also asked for feedback and thoughts on how to improve his interview

25  skills.  *Id.* ¶ 11; *see also id.*, Ex. A (email correspondence between Nunez, Mundy, and Owensby).

26  Mundy and Owensby met with Nunez on November 3, 2021, to discuss the email and provide

27  feedback.  In an email from Owensby to Brian Davidson right after the meeting, Owensby stated

28  that he and Mundy had just finished a "1:1 with Martin via Bluejeans," where they "discussed his

United States District Court
Northern District of California

10

email and the statements he made about our decision to move Jeff into the city." *Id.*, Ex. A.  The email also outlined topics discussed on the phone call, including "reasons why we chose to move Jeff into SF," "how [Cellco] can assist [Nunez] gain additional experience inside and outside of his current team," and some "high level feedback on one of the interview questions." *Id.*

### H.    Other incidents Nunez perceived to be retaliatory

In the FAC, Nunez identified several other interactions that he perceived to be, taken together, "retaliation and discrimination."  FAC at pp. 13-15.  For instance, in December 2021, Nunez alleged that he identified "discrepancies" in his commission statement, half of which were "rectified by month's end," that "affected his pay and his ranking."  FAC at p. 13; Opposition to Defendant's Motion for Summary Judgement ("Oppo.") [Dkt No. 67] 3-4; Dkt. No. 67-1 at pp. 4-8 (email chain between Nunez and Kinsey).

In January 2022, at his performance review, Nunez was told that he failed again to meet the 80% composite score from the last three months and was placed on an Action Plan that focused on sales activities and behaviors intended to improve and avoid progression to the formal performance improvement process.  Rippolone Decl. ¶ 3, Ex. B at 77-78; Kinsey Decl. ¶ 6, Ex. B at 1; Davidson Decl. ¶ 11, Ex. E at 3.  Nunez alleges in his FAC that this Performance Improvement Plan ("PIP") was retaliatory, *see* FAC at p. 13, and that his performance records that informed the PIP were "skewed due to the discrepancies mentioned before, lack of stock, and other discrepancies found with PWS sales," *see id.*, at p. 14.  He offered no evidence of this on summary judgment.

### I.    Nunez's 2022 internal complaint

On February 28, 2022, Nunez emailed Anais Sanchez, Senior Manager, Human Resources Business Partner, and Davidson requesting clarification about the Managing Partner hiring process and decision made earlier that year.  Declaration of Anais Sanchez ("Sanchez Decl.") ¶ 5, Ex. A at 1-2 [Dkt No. 64-5].  He complained that the process was "unfair" and prevented his "ability to move 'up' in my channel, geographical territory, and within my team in San Francisco."  *Id.*, Ex. A (February 28, 2022 email).  His complaint focused on his belief that favoritism played a role in his non-selection for the San Francisco Managing Partner role and that Kinsey's appointment to

1    the position was unfair.  *Id.*  In that complaint, Nunez did not mention that he felt the hiring

2    process was discriminatory or retaliatory.  *Id.*

3            On March 1, 2022, Sanchez met with Nunez to discuss his concerns.  *Id.* ¶ 6.  After their

4    meeting, Sanchez interviewed multiple witnesses, including Mundy, about the selection process

5    for the San Francisco Managing Partner position.  Sanchez Decl. ¶ 7.  Mundy reasserted that San

6    Francisco is a high profile and complex territory to which an inexperienced leader would not be

7    suited.  That was why, Mundy said, the job requisition was cancelled, and Kinsey was moved

8    from his position in Santa Rosa.  *Id.*

9            On March 4, 2022, an incident occurred in which Heath Owensby referred to another

10   Cellco employee, J. Valencia, as a "pending illegal" during a recognition call announcing winners

11   of an internal Cellco contest.  FAC at p. 15; Sanchez Dec. ¶ 8.  On March 14, 2022, Nunez had a

12   call with Owensby in which he informed Owensby that he was set for paternity leave in April

13   2022.  *Id.* at 16-17.  The next day, Nunez was placed on a Documented Counseling Plan, which set

14   forth gaps in his previous performance, ongoing expectations for his role and that Nunez "must

15   have 3 consecutive months of satisfactory performance."  Kinsey Decl. ¶ 9, Ex. D at 1-2;

16   Rippolone Decl. ¶ 3, Ex. B at 85-86.

17           According to the FAC, on March 17, 2022, Nunez met with Sanchez to discuss "details of

18   his experience with the [PIP]."  FAC at p. 17.  Nunez alleged that Sanchez "utilized a non-standard

19   and non-Verizon Excel spreadsheet to present the PIP details," which he found confusing.  *Id.*

20   "Recognizing the PIP discussion was stagnating," Nunez says that he "took the initiative to report"

21   the "pending illegal" comment incident from March 4, 2022.  FAC at p. 18.  Sanchez

22   "immediately" asked for all the details and initiated the investigation.  *Id.*  Nunez also claims that

23   Sanchez "coach[ed]" him into "identifying with the nature of the derogatory remark" and "advised

24   [Nunez] on crafting an email letter to upper management, suggesting and emphasizing the undue

25   stress is happening during a pivotal personal period," which she thought might "persuade them to

26   reconsider the PIP documentation." FAC at p. 18.  Nunez's characterizations of this meeting are

27   solely in the FAC and not included in the record on summary judgment.

28

United States District Court
Northern District of California

Sanchez's declaration on summary judgment confirms that the meeting occurred but says nothing about Nunez's other allegations from the FAC. After the meeting, Sanchez investigated the "pending illegal" comment. She interviewed Owensby and Valencia together and met with Owensby "several times" during the investigation. Sanchez Decl. ¶ 9. Owensby told Sanchez that he had called Valencia after the recognition call in question to apologize. *Id.* Sanchez also met with Valencia: Valencia stated that he had not been offended and confirmed that Owensby had called to apologize. Valencia also stated that Nunez had told him that Nunez was bothered by the remark, but Valencia did not agree with Nunez's perception of the events and did not interpret the remark the same way. *Id.* ¶ 10.[3]

Nunez says that HR's response to his report of the pending illegal comment resulted in a noticeable change in the workplace atmosphere. He alleged that "from the conversation near the end of March 2022 onwards, [Owensby] avoided any interactions with the plaintiffs' work group." FAC at p. 18. Kinsey relaxed his stance on the PIP. *Id.*

Sanchez met with Nunez again on or around April 26, 2022, to continue discussing his concerns relating to the "pending illegal" comment; Nunez told her he believed the comment was retaliatory. Sanchez Decl. ¶ 11; FAC at 19. On May 10, 2022, Sanchez met with Owensby to further discuss Nunez's concerns relating to the "pending illegal" comment. Sanchez Decl. ¶ 12. Owensby made clear that his comment was not in reference to Nunez nor was it about Nunez's immigration status. *Id.*

On May 23, 2022, Sanchez shared her findings from her investigation with Nunez, explaining that it was her understanding that Owensby's comment was not directed toward Nunez. *Id.* ¶ 13. But because the investigation substantiated that Owensby had in fact made the "pending illegal" comment, Owensby was placed on a Final Written Warning, which made him ineligible to "post for other positions" within the company for approximately 12 months. He was also required

---

[3] In the FAC, Nunez states that Valencia "confided" in him in April 2022 that he had provided a "misleading account" of the incident to HR, "suggesting that [Owensby] had coerced him into fabricating a justification for the derogatory comment," which Nunez interpreted as "underscor[ing] the discriminatory nature of [Owensby's] comment [and] suggest[ing] a deliberate attempt to manipulate the narrative around HR, further reinforcing the retaliation against [Nunez.]" FAC at p. 16. He produces no evidence of these statements.

United States District Court
Northern District of California

1 | to meet with his director to create a development plan to improve his communication with all

2 | employees. *Id.* Owensby also received a "Developing" rating for the year as a further

3 | consequence of his comment. *Id.*

### J. Nunez's EEOC complaint and resignation

On or about August 16, 2022, Nunez filed a complaint with the EEOC. *Id.*, at p. 20. On August 29, 2022, he emailed Mundy, Owensby, and Kinsey listing various "grievances" and asking for feedback. Rippolone Decl. ¶ 5; *id.*, Ex. D (Nunez Depo. Vol II) at 241-242. The next day, Mundy let Nunez know that he had informed Human Resources and Nunez's leaders to make sure his concerns were responded to. Rippolone Decl. ¶ 5; *id.*, Ex. D (Nunez Depo. Vol. II) at 241-242. Mundy also referred Nunez back to previous conversations with him and Owensby in 2021, in which they had all discussed some of the "grievances" listed in the email. He reiterated that HR had explained to Nunez that he was on a PIP because of his composite score in February and explained why he had received a Documented Counseling Plan. *Id.* Nunez responded on August 17, 2022, thanking Mundy for his response.

On September 7, 2022, Nunez gave Cellco a 14-day notice that he was resigning over the list of grievances on the email sent to Mundy, Owensby, and Sanchez. A few days later, he asked to withdraw his resignation. Sanchez Decl. ¶ 15. Cellco chose to accept it. *Id.*

Nunez alleged in the FAC that Human Resources explicitly cited his initiation of an investigation with the EEOC as the reason for Cellco's refusal to allow the withdrawal of his resignation, *see* FAC at p. 21. He provided no evidence of this in the record. Sanchez, Cellco's Human Resources Associate Director, stated that "it is not standard practice for Cellco to allow employees to rescind their resignation," and that fact, coupled with "[Nunez's] performance issues," prompted Cellco to "make the decision to accept his resignation[.]" Sanchez Decl. ¶ 15.

### LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-

United States District Court
Northern District of California

14

1   moving party's claim, or to a defense on which the non-moving party will bear the burden of

2   persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

3   made this showing, the burden then shifts to the party opposing summary judgment to identify

4   "specific facts showing there is a genuine issue for trial."  *Id.*  The party opposing summary

5   judgment must then present affirmative evidence from which a jury could return a verdict in that

6   party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

7        On summary judgment, the court draws all reasonable factual inferences in favor of the

8   non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility

9   determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

10  facts are jury functions, not those of a judge."  *Id.*  However, conclusory and speculative testimony

11  does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See*

12  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

13       When a plaintiff is proceeding pro se, the court has an obligation to construe his motions

14  and pleadings liberally.  *See Zichko v. Idaho*, 247 F.3d 1015, 1020 (9th Cir. 2001); *see also*

15  *Christensen v. CIR*, 786 F.2d 1382, 1384 (9th Cir. 1986).

16                                    **DISCUSSION**

17  **I.    VERIZON**

18       Verizon is a parent company for Cellco Partnership.  Rippolone Decl. Ex. F at 1-3.  At all

19  relevant times, Cellco was Nunez's only employer.  *Id.* ¶¶ 6, 7, Ex. F at 1-3.  Verizon did not

20  employ Nunez.  There is no evidence to the contrary.  *See* Discovery Order [Dkt No. 43]; *see also*

21  Defendants Discovery Letter Brief [Dkt No. 41]; Shipman Decl.; DiMascio Decl.; *see* discussion

22  *supra* "Procedural History".  Nunez cannot make a Title VII claim against Verizon because there

23  was never an employment relationship between them.  Summary judgment is GRANTED in favor

24  of Verizon for each cause of action and the case against it is dismissed.

25  **II. DISCRIMINATION CLAIMS BASED ON NATIONAL ORIGIN AND RACE**

26       To establish a prima facie case of employment discrimination, a plaintiff must show that

27  (1) he belongs to a protected class; (2) he was performing according to the employer's legitimate

28  expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably

United States District Court
Northern District of California

1    than similarly situated employees outside of his protected class.  *McDonnell Douglas Corp. v.*

2    *Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Once the plaintiff meets this

3    initial burden, the burden then shifts to the employer "to articulate some legitimate,

4    nondiscriminatory reason for the" adverse employment action.  *Id.*  The plaintiff retains the burden

5    of persuasion and can then rebut this purported nondiscriminatory reason by providing evidence

6    that it is pretextual. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct.

7    1089, 67 L.Ed.2d 207 (1981).

8           Cellco is entitled to summary judgment on Nunez's discrimination claim under Title VII

9    because he has not established a prima facie case of discrimination and, even if he had, Cellco has

10   articulated a legitimate, nondiscriminatory reason for the adverse employment actions of which

11   Nunez complains.  *See* Motion for Summary Judgment ("Motion") [Dkt. No. 64] 15-18.

12          **A.  Discrimination with respect to territory assignments**

13          Cellco asserts that Nunez cannot prove the second element of a prima facie discrimination

14   claim for his discriminatory territory assignment claim because the undisputed facts show that he

15   was not meeting the legitimate performance expectations of his role.  His performance deficiencies

16   persisted from 2019 until he resigned from Cellco in 2022.  Although Nunez believes that he was

17   more qualified and better suited to various positions than his colleagues who got more favorable

18   territory assignments, besides his belief there is no evidence of this assertion.  The record

19   contradicts it.

20          In 2020, leading up to the territory assignment that Nunez contends was discriminatorily

21   motivated, Nunez's then-manager, Tim Gartner, was actively managing his work.  From 2020 into

22   2021, Gartner repeatedly placed Nunez on notice that his performance was not meeting

23   expectations and required improvement.  Davidson Decl. ¶ 14.  Gartner's notes from August 2020

24   stated that Nunez's productivity was "still at the bottom of the pack," identified ways in which

25   Nunez could improve, and stated that Gartner would like to "take action now so that it's not a

26   similar conversation" at the next month's check in.  *Id.*, Ex. F.  Performance notes that Gartner

27   shared with Nunez in October 2020 stated: "as a tenured BAM, I not only expect better, but I need

28   better, please work to gain more meetings . . . so that we can identify more opportunities and drive

United States District Court
Northern District of California

timelines. . . . Please identify your gaps and again let's work on ramping the funnel up as quickly as possible." *Id.* More notes from what is referred to as a "1 on 1 Funnel Review" for the last week of October 2020 show Gartner informing Nunez that he was "still way behind target for growth," and identifying "gaps" in his performance. *Id.*

Nunez offers no evidence to contradict Cellco's record of his performance issues or to call the veracity of that record into question. He insists that its position is "debunked" by performance evaluations, but the performance evaluations that he points to in his Opposition papers support Cellco's position. *See* Oppo. at 2 (stating that defendants' arguments about his poor performance are "directly contradicted" by his end-of-year performance evaluations, and citing performance evaluations from 2016 and 2018 where he was rated "performing," and from 2019 where he was rated "developing," which is the lowest rating available). Nunez does not contest that in 2019, 2020, and 2021, his performance reviews indicated that he was not meeting expectations, "at the bottom of the pack," and "still way behind target for growth." Davidson Decl., Ex. F.

Nunez also cannot prove the fourth element of a prima facie discrimination claim because he has failed to identify any similarly situated Cellco employees who did not share his protected characteristics who were treated more favorably. Nunez makes broad generalizations about how non-Hispanic, Caucasian employees with less experience than him were given better positions, but he has produced no evidence to support this theory: He admits that he has no personal knowledge about these other employees' qualifications, education, experience, tenure, performance metrics, or the reasons why they were selected for territories that Nunez alleges were more favorable. Rippolone Decl., Ex. B (Nunez Depo. Vol. I) at 137-140, 142-145, 146-147.

Cellco conducted an internal investigation after Nunez raised concerns that the territory assignment process was discriminatory. *See* Davidson Decl. ¶¶ 16-18; *id.*, Ex. G (Investigation Notes). Brian Davidson interviewed "multiple witnesses," one of whom was Nunez's then-Managing Partner, Tim Gartner, who was in charge of deciding who would fill vacant territories. Gartner confirmed that he used "performance ratings, performance activity, time on the team, specific needs and knowledge needed in an open territory, and the background and strength of the applicant pool, including leadership experience" to determine who should be assigned what

1    territory, and did not consider national origin or whether an employee spoke Spanish to determine

2    where they should be placed.  *Id.* ¶ 17; *see also id.*, Ex. G.  He also revealed that he had offered

3    Nunez a new territory after he complained about being assigned to the Mission territory, but

4    Nunez declined that opportunity and chose to remain in the Mission.  *Id.*, Ex. G.  There is no

5    material fact in dispute in the record to rebut that Nunez was not discriminated against regarding

6    the territory assignments.

7              **B.  Discrimination with respect to the Managing Partner decision**

8              The same is true for Nunez's theory of discrimination with respect to Cellco's Managing

9    Partner decision.  He produced no evidence supporting his theory that he was passed over for the

10   San Francisco Managing Partner position because of discriminatory animus.  He testified that he

11   believed he interviewed well, but admits that no one ever told him that at Cellco.  Rippolone Decl.

12   Ex. B (Nunez Depo. Vol. I) at 186-187.  According to his managers, Nunez's interview was

13   lackluster.  Mundy Decl. ¶ 4.  It is not enough for Nunez to survive summary judgment that he

14   believes he was competent, or that he believes that he performed well in his interview, when the

15   moving party has submitted unrebutted evidence to the contrary.  *See Bradley v. Harcourt, Brace*

16   *& Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (holding, under Title VII, "an employee's subjective

17   personal judgments of her competence alone do not raise a genuine issue of material fact."

18   (citation omitted)).

19             Nunez produced no evidence that employees outside his protected class were treated more

20   favorably in the Managing Partner hiring process.  Cellco's determination that no interview

21   applicant was sufficiently qualified to take over the Managing Partner position in San Francisco

22   belies that theory.  *See* Mundy Decl. ¶ 5.  Although Nunez testified at his deposition that the

23   Managing Partner position was given to a "Caucasian male with similar qualifications as myself,"

24   *see* Rippolone Decl. Ex. B (Nunez Depo. Vol I) at 190, when asked how Kinsey (who was

25   selected to fill the role) had the same qualifications as Nunez, Nunez stated "[o]h, I don't know,"

26   *id.* at 191:1-8.[4]  Kinsey, the individual who was chosen to fill the San Francisco Managing Partner

27

28   ───────────────────
     [4] In his Opposition Nunez raises issues with his deposition transcript.  He says he was "not given
     an opportunity to review his answers or provide any clarifications to the transcript." Dkt. No. 67 at

1    role over all applicants who applied for it, had fourteen (14) years of experience in a Managing

2    Partner position in Santa Rosa.  Nunez had never been a Managing Partner and never led a team.

3    And the individual who was chosen over Nunez to fill Kinsey's spot and lead the Santa Rosa team

4    had a strong interview and eight years of good performance results as a SAM in Santa Rosa, as

5    well as leadership experience at AT&T.  Mundy Decl. ¶ 8.

6        The record does not support Nunez's claims for race or national origin discrimination,

7    either with respect to territory assignments or with respect to the San Francisco Managing Partner

8    hiring process.  He has not made a prima facie case for discrimination.

9        **C.  Cellco's legitimate non-discriminatory reason for employment decisions**

10       If Nunez had established a prima facie case, Cellco has provided a legitimate

11   nondiscriminatory reason for the actions he challenges, which Nunez is unable to rebut: Nunez's

12   performance was relatively poor compared to other candidates for the positions that he sought.

13   Nunez continuously failed to meet performance expectations from the end of 2019 all the way

14   through 2022.  *See* discussion *supra* "Background," Section D (detailing Nunez's documented

15   performance problems at Cellco); *see also* discussion *supra* Sections II(A)-(B).

16       In response and at the hearing on this motion, Nunez insisted that he performed well at

17   Cellco.  *See* Oppo. at 2.  His beliefs about his performance, directly contradicted by performance

18   reviews, cannot create a genuine dispute that the reason for choosing other employees for

19   competitive positions was pretextual.  *Bradley*, 104 F.3d at 270 (holding, under Title VII, "an

20   employee's subjective personal judgments of her competence alone do not raise a genuine issue of

21   material fact" regarding pretext (citation omitted)).[5]

22   _____

23   3.  Cellco states this is "patently false."  Reply 3.  To ameliorate any concern about "irregularities"
     between what Nunez testified to in his deposition and what he meant, or actually said, the
24   defendants have attached the Court Reporters' Certification for both of Nunez's deposition
     transcripts noting that Nunez was asked to review his transcript.  Dkt. No. 64-1.  The Court
25   Reporter's office also sent Nunez a letter, dated September 15, 2023, after his first deposition
     session on August 27, 2024.  Ripplone Decl. ISO Reply, Ex. G.  Another letter was sent to him
26   after his second deposition session.  Both letters told Nunez the transcripts were available for his
     review, to make corrections, if necessary.  No such corrections were made.

27   [5] In his Opposition, Nunez also argues that "commission tampering" was responsible for his poor
     performance reviews.  Dkt. No. 67 at 3.  But he offers no evidence in support of this theory.  He
28   offers a string of emails from January 2022 between himself and Kinsey about "discrepancies" in

United States District Court
Northern District of California

United States District Court
Northern District of California

Nunez also argues that Cellco did not consider his performance reviews in making employment decisions but instead considered his race and national origin. Oppo. at 9-10. He provides no evidence to support this speculation, and the record directly contradicts it. When Cellco met with Nunez in November 2021 to discuss why he was passed over for the Managing Partner position, Owensby and Mundy told him that Kinsey had been selected as Managing Partner because of his experience, Panoski had been hired as Santa Rosa Managing Partner because he interviewed well and had experience, and Nunez, in contrast, had relatively less experience and was "struggling with his own performance issues and not meeting his sales targets." *See* Mundy Decl. ¶ 12; *see also* discussion *supra* "Background," Sections E-G.

Nunez has not made a prima facie case for race or national origin discrimination under Title VII. Cellco has a legitimate, non-discriminatory and unrebutted reason for the adverse actions Nunez challenges. The defendants' motion for summary judgment is GRANTED, and this claim is dismissed.

## III.    RETALIATION

"To make out a prima facie case of retaliation [under Title VII], an employee must show that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). If the plaintiff establishes a prima facie case, "the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision." *Id.* Once the defendant articulates such a reason, the plaintiff "bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Id.*

Nunez cannot establish the third element of a prima facie case. In the FAC, Nunez identifies his PIP, written warnings and performance improvement plans to which he was subjected, as adverse employment actions causally linked to his decision to file internal

various orders for which he was responsible, *see* Dkt. No. 67 at 4-8, but that email chain ends with a resolution of the problem by Kinsey, which is consistent with Nunez's allegation that the issue was "rectified by month's end." FAC at p. 13; *see* discussion *supra* "Evidence of Record on Summary Judgment," Section H.

1    complaints with HR in April 2021 reporting what he believed might be "unfair business practices"

2    "within the Business to Business sector and a third party partner," and reporting what he believed

3    to be discriminatory territory assignment procedures. FAC at p. 5.[6] His burden at summary

4    judgment is to offer evidence that he would not have been subjected to the alleged adverse

5    employment actions "but for" his protected activity.

6        Nunez alleged in the FAC that being "bypassed for the San Francisco role" and the Santa

7    Rosa role, given his history of raising concerns with HR, "bore the unmistakable hallmarks of

8    discrimination and retaliation, orchestrated . . . in direct response to his past HR complaints[.]"

9    FAC at p. 5. No evidence backs this up. The record does not show a causal link between Nunez's

10   complaints and the adverse employment actions that he challenges; his long-documented history

11   of performance problems poses an insurmountable barrier to proving his case.

12       To the extent that Nunez argues his PIP and lack of promotion were retaliation for his

13   complaints in April 2021, his theory is belied by his performance issues, which had persisted since

14   2019 with no meaningful improvement. *See* Davidson Decl. ¶¶ 11-13 (describing Nunez's

15   performance struggles since July 2019, accommodations in reviews made for the COVID-19

16   pandemic, and continuing failure to meet reasonable performance objectives into 2021). He was

17   placed on an Action Plan in January 2022, eight months after he filed the internal complaints;

18   three months later, when his performance did not improve, he was placed on a Documented

19   Counseling Plan. Kinsey Decl. Ex. B (Action Plan); Rippolone Decl. Ex D (Documented

20   Counseling Plan); Rippolone Decl. Ex. B (Nunez Depo. Vol. I) at 85-86.

21       Nunez received several warnings that failure to improve his metrics could result in being

22   placed on a performance improvement plan; when he did not improve, he was placed on an

23   improvement plan. In his deposition, Nunez testified that he did not think it was important to

---

[6] Defendants argue that Nunez also cannot show the first element, because PIPs are not "materially adverse" "adverse employment actions," nor is refusing to accept a request to withdraw a resignation. Motion 19. Defendants *Cozzi v. County of Marin*, 787 F. Supp. 2d 1047 (N.D. Cal. Apr. 18, 2011), for the rule that written warnings and performance improvement plans are not adverse actions where they do not materially affect the terms and conditions of employment. Because Nunez's retaliation claim clearly falters on the third element of a prima facie case, I will assume without deciding that he has shown an adverse employment action here.

United States District Court
Northern District of California

1    review the performance expectations in his PIP.  Rippolone Decl. Ex. B (Nunez Depo. Vol. I) at

2    75:6-22.  That speaks volumes about his claim.  In sum, the record does not support a causal link

3    between his protected actions and the adverse actions he experienced; the eight months elapsed

4    between his complaints in April 2021 and his performance improvement plans in January 2022,

5    and his long history of performance issues, are fatal to his theory.

6           To the extent that Nunez argues that Owensby's comment to Valencia about being a

7    "pending illegal" was somehow a retaliatory act related to Nunez's April 2021 complaint about

8    potential race discrimination in territory assignment decisions, there is no evidence that Owensby

9    intended that comment to be targeted at Nunez, and there is no evidence that his comment was in

10   any way related to an employment decision.  *See Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434,

11   1438 (9th Cir. 1990) (stray comments unrelated to the decisional process were not sufficient to

12   raise triable issues concerning the discriminatory nature of a discharge).

13          Finally, in the FAC, Nunez alleges that Cellco's decision to accept his voluntary

14   resignation even after he tried to rescind it was retaliatory or amounts to constructive discharge.

15   Cellco explained why it did not accept Nunez's attempt to withdraw his resignation; its supported

16   explanation sharply contrasts Nunez's unsupported allegation.  Cellco's Human Resources

17   Associate Director, by way of sworn declaration, stated that "it is not standard practice for Cellco

18   to allow employees to rescind their resignation." Sanchez Decl. ¶ 15.  That, together with

19   "[Nunez's] performance issues," which have been detailed above, led Cellco to accept Nunez's

20   resignation over his attempted withdrawal.  *Id.*  There is no evidence to dispute Cellco's

21   explanation.  Although Nunez alleges in the FAC that Cellco told him, when it refused to honor

22   his withdrawal of his own resignation, that it did so because he filed an EEOC complaint, *see* FAC

23   at p. 21, he never offered any evidence to support this allegation.  He did not mention the

24   allegation in his opposition brief or present any other arguments implying that Cellco refused to

25   allow him to withdraw his resignation in retaliation for his internal or EEOC complaints.  *See*

26   *generally* Oppo. [Dkt. No. 67].

27          With respect to constructive discharge, an employee's resignation may give rise to a Title

28   VII cause of action if the circumstances amounted to a constructive discharge: i.e., where a

United States District Court
Northern District of California

reasonable person would feel compelled to resign because the employer intentionally caused objectively intolerable working conditions or knowingly allowed them to exist. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 143-44 (2004). Here, nothing about Nunez's allegations or testimony suggests that he was subjected to intolerable working conditions at Cellco. He has identified one racially charged comment, directed at another employee, for which the perpetrator was placed on a disciplinary status. *See* Sanchez Decl. ¶¶ 9-10. Other than that, his allegations make clear that where Nunez expressed concerns about his working environment, Cellco worked to address them. *See id.*, Ex. A (email with Nunez, setting up time to speak about Nunez's concerns with respect to promotion decisions); Davidson Decl. Ex. G (describing the investigation that occurred after Nunez filed internal complaints in April 2021 about unfair business practices and race discrimination in territory assignment). Nunez does not dispute that his managers and Human Resources representatives worked with him at various points to improve his performance and address the concerns he did express about his working environment.

The record does not support Nunez's retaliation claim. Defendants' motion for summary judgment on Nunez's claim of retaliation is GRANTED, and this claim is dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion is GRANTED. This action is dismissed in its entirety. The Clerk shall close the case and enter judgment in favor of the defendants.

**IT IS SO ORDERED.**

Dated: June 26, 2025

William H. Orrick
United States District Judge